PEOPLE v. FOGEL.   (No. 7203.)

(Supreme Court, Appellate Division, First Department.   May 7, 1915.)

DISORDERLY CONDUCT ⬳9—CONVICTION—PROOF.

 A conviction of disorderly conduct, in violation of Consolidation Act (Laws 1882, c. 410) § 1458, was unauthorized, where there was no competent evidence of defendant's guilt.

 [Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. § 1; Dec. Dig. ⬳9.]

 Hotchkiss, J., dissenting.

Appeal from Court of General Sessions, New York County.

Lawrence Fogel was convicted in the City Magistrate's Court of disorderly conduct tending to a breach of the peace. From an order

affirming the conviction by the Court of General Sessions, he appeals. Reversed, and defendant discharged.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

Clark L. Jordan, of New York City, for appellant.
Robert S. Johnstone, of New York City, for the People.

McLAUGHLIN, J.  The defendant was convicted in the City Magistrate's Court of the City of New York of disorderly conduct (section 1458, Consolidation Act), for which he was sentenced to be confined in the workhouse for six months.  On appeal to the Court of General Sessions, the judgment of conviction was affirmed, and an appeal is now taken to this court.

The charge made against the defendant was that in the lobby of the Hotel McAlpin, in the city of New York, on the 22d of October, 1913, he used—

"threatening, abusive, and insulting behavior, with intent to provoke a breach of the peace, and whereby a breach of the peace might be occasioned; that said defendant did then and there loiter in the lobby of said hotel, annoying and accosting guests of the hotel, and also approached one of the guests for the purpose of engaging in a game of chance of coin matching."

The proof presented to establish the charge was that on the 21st of October, 1913, one Hardwick, who resided in Virginia, was a guest of the hotel; that early in the evening of that day the defendant met Hardwick in the lobby, and asked him how long the hotel had been built, to which Hardwick responded he was a stranger and could not tell him.  What followed is best told in Hardwick's own words:

"He says: 'I am a stranger here, too; just first in town; just got in here. I am glad to meet some one. * * * I come from down Jacksonville, Fla.' I said: 'I come from Virginia, both down South.' He said: 'Yes; it does me good to meet somebody from down South. * * * How long are you going to be in town?' I said: 'A few days, I guess.' He says: 'I would like very much for to go around with you some time.' I says: 'I have got an engagement at 8 o'clock. I cannot go out to-night; probably I can go some other time.' He said: 'Suppose your friends are not coming? It is getting late.' He looked at his watch. I said: 'I am not uneasy about that.' He said: 'What are you going to do to-morrow morning?' I said: 'I have got an engagement at half-past 1, but in the morning I am not going to do anything.' He said: 'What time do you get up?' I said: 'I don't have to be in a hurry; I am not on any business; about 7 o'clock, I guess.' He said: 'Suppose we meet at ten o'clock. I will meet you here in the office.' I said: 'So good.' I turned around and walked off. * * * As I got near to the office, I looked over my shoulder. He was behind me. He said: 'I don't suppose your people are coming. It is quite late; probably they are not coming.' I said; 'It is all right; they will be here; I am not uneasy at all.' * * * I put my hand in my inside pocket and gave him one of my cards. He said: 'I have not any card of my own. My baggage has not been carried to my room yet. Have you one of the $2 rooms?' I said: 'Yes; on the nineteenth floor—No. 1947.' He said: 'Mine is 1953. Have you a card?' I put my hand in my pocket and pulled out a card. I said: 'Write your name on the back of that.' * * * Pulled out a pencil and handed it to him. * * * Then he wrote that name. * * * Q. When did you meet this defendant again? A. At about twenty-five minutes after 9 on the 22d; I came down from the room into the lobby of the hotel to keep the engagement which we had made at 10 o'clock that morning. At about quarter to 10, I guess it was, in walked the gentle-

man, who walked up and very politely spoke to me. He squeezed my hand pretty hard; that ring hurt a little. He was very glad to see me, and hoped I had a good time the night before. I thanked him very much, and got up as if I was going to walk away from him. * * * He says: 'Hold on a minute. I have to go up to my room to get a clean handkerchief.' I said: 'All right.' * * * In a few minutes he came downstairs. He said: 'All right; we are ready.' I said: 'I want to stop here at the office.' He said: 'All right.' I got up, and we walked toward the office. As we were walking towards the office, I saw Mr. Power and Mr. Denniston. I gave them a wink over my shoulder. They walked up and took him."

Denniston, the house detective, took the defendant to his office on the third floor and put various questions to him, most of which he refused to answer. He refused to give his name, tell what his business was; and denied telling Hardwick that he had room 1953 in the hotel. When asked where he went on the elevator, said he went to the toilet on the floor above. On being informed by the detective, who was in the elevator at the time, that he went to the nineteenth floor, the only response he made was a shrug of his shoulders.

The proof thus offered did not, in my opinion, establish that the defendant was guilty of the charge made against him, or any part of it; nor did it show that he was at the time guilty of disorderly conduct, or that any of his acts tended in any way to a breach of the peace. There is not a particle of proof that he used any threatening, abusive, or insulting language, or that his behavior was such as tended to provoke a breach of the peace. Nor is it of such a character as to show that Hardwick, the guest of the hotel, was in any way annoyed by what he did. It is quite inconceivable, if he were annoyed, that he should voluntarily have given to the defendant his card and made an appointment to meet him the following morning. There is not a suggestion in the proof that he approached Hardwick "for the purpose of engaging in a game of chance of coin matching"; on the contrary, the only evidence bearing on that subject is that he denied being so engaged. He did admit, according to the testimony of the house detective, that he was a gambler, and worked for gambling houses and bookmakers; but no such information was conveyed to Hardwick, nor was he asked to engage in a game of chance of any kind.

Before one can be convicted of a crime, under our system of jurisprudence, a specific charge has to be made, and then that charge proved by competent evidence. Here the charge was made, but no proof offered which sustained it. The judgment of conviction was affirmed by the Court of General Sessions on the ground, as appears from the opinion, that the defendant was a "common crook." No evidence whatever was offered to establish that fact. This the judge seemed to appreciate, because in his opinion he said:

"A great number of professional crooks pass before the magistrate daily, and by their conduct, manner, and demeanor, they are an exhibit in the case which is of value to him in construing the evidence in reference to them. He becomes an expert from daily contact and observation, his court being a psychological laboratory for qualitative analysis."

Courts, at the present time, have a tendency, and quite properly, to overlook technical errors or defects, and affirm judgments of conviction if satisfied that the defendant has had a fair trial and is guilty

of the charge made against him. But they have not yet reached the point where they will affirm a judgment of conviction simply because the defendant was, without his consent, made "an exhibit in the case," or because the trial court is "a psychological laboratory for qualitative analysis" of the guilt or innocence of the person accused; on the contrary, evidence must be produced showing that the person is guilty of the crime charged, so that when the conviction is brought under judicial review an appellate court can see, minus the "exhibit" and the "qualitative analysis," that the crime charged was properly proven according to established rules of law.

The judgment of conviction is therefore reversed, and the relator discharged.

INGRAHAM, P. J., and LAUGHLIN and DOWLING, JJ., concur.

HOTCHKISS, J. (dissenting). Although the affidavit on which the defendant was arrested charged the defendant with "using" in the lobby of the Hotel McAlpin, in the city of New York, "threatening, abusive, and insulting behavior, with intent to provoke a breach of the peace, and whereby a breach of the peace might be occasioned," this being the language of subdivision 3 of section 1458 of the Consolidation Act, the commitment recites that the defendant has been found "guilty of such disorderly conduct as in my opinion tends to a breach of the peace." The affidavit was apparently framed in the language of section 1458; but I think it was sufficient under section 1459, under which defendant was convicted. Section 1459 is as follows:

"Whenever it shall appear, on oath of a credible witness, * * * that any person in said city and county has been guilty of any such disorderly conduct as in the opinion of such magistrate tends to a breach of the peace, the said magistrate may cause the person so complained of to be brought before him to answer the said charge."

The breaches of the peace covered by section 1459 are not exclusively the disorderly acts specified in section 1458, but include any disorderly conduct such as in the opinion of the magistrate tends to a breach of the peace. People v. Mansi, 129 App. Div. 386, 113 N. Y. Supp. 866. To constitute a breach of the peace, neither turbulence nor personal violence is necessary. The offense may consist of any act which invades the security and protection which the law affords every citizen. Davis v. Burgess, 54 Mich. 514, 20 N. W. 540, 52 Am. Rep. 828; State v. White, 18 R. I. 473, 28 Atl. 968.

My Brother McLAUGHLIN has quoted a considerable portion of the testimony taken by the magistrate, but he has omitted some things which I regard as significant. The defendant told Hardwick his name was Somerville, and he wrote the name "F. Somerville" on a card which he gave to Hardwick. In addition to the acts referred to by Brother McLAUGHLIN showing that defendant falsely sought to convey to Hardwick the impression that he was a guest of the hotel, defendant told Hardwick, "My baggage has not been carried to my room yet"—this in addition to his making an excuse to go to his room to get his handkerchief, getting into the elevator ostensibly to go to his

room, but alighting at one of the lower floors. He also told Hardwick that he "was a traveler for the 'Grape Juice people.'" Subsequently he told Officer Murray that this was untrue. He admitted to Denniston, the hotel detective, that he was a gambler, and worked for gambling houses and book makers. When asked by Denniston why he had told Hardwick that he had a room in the hotel, defendant denied that he had so told Hardwick, and when (according to Denniston's testimony) Denniston told him that he had seen him in the hotel many times, the defendant—

"said that he had never robbed anybody *in the hotel* and that he did not intend to rob any one in the hotel. He said that he was going to take this man (Hardwick) out to show him around town. Q. Did you say anything to the defendant about the game of chance? A. Yes; talked very freely with him about that. * * * Q. What did he say? A. He did not swindle anybody in the hotel."

And referring to the claim which defendant seemed to put forward that Denniston should not interest himself in what might happen to people outside of the hotel, defendant said:

"That is none of your affair; you are not responsible for what happens away from the hotel."

We thus have the case of a vagabond, under an assumed name, who thrusts himself upon a nonresident guest of the hotel, is persistent in his attentions, and, by false and deceitful conduct elaborate in its details, plainly endeavors to create a favorable impression upon and to induce the stranger to accept the defendant as his cicerone about the city. When taxed with his intention to inveigle Hardwick into some embarrassing situation, the defendant, while not in words admitting that such was his purpose, plainly attempted to exculpate himself on the ground that it was not his intention to execute his purpose upon the hotel premises. A violation of the section under which the defendant was convicted is not, strictly speaking, a crime; nor is a proceeding thereunder in a technical sense a criminal case. Violations of the section are included among those "minor offenses, colloquially classified as crimes, which are merely violations of police regulations." People ex rel. Burke v. Fox, 205 N. Y. 490, 494, 99 N. E. 147.

We may therefore read the evidence, unaffected by the strict rule of "reasonable doubt" and with a view to whether it was sufficient to induce the presumption that defendant's conduct violated the section in question. It seems to me that we should be closing our eyes to a practice common to "confidence men" for time out of mind, if we did not regard this evidence, standing as it did wholly unexplained, as sufficient to justify the presumption that the defendant was some kind of a "crook," who had selected Hardwick as his intended victim, and whom it was his purpose to betray into some detrimental act.

The judgment should be affirmed.